J-S25045-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: W.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M., MOTHER | |
| | No. 845 EDA 2026 |

Appeal from the Order Entered February 20, 2026
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-DP-0000030-2024

BEFORE:  SULLIVAN, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 4, 2026**

J.M. (Mother) appeals from the order granting the request of Bucks County Children and Youth Social Services (the Agency) and changing the permanency goal of her dependent son, W.M. (Child), from reunification to adoption.[1]  We affirm.

*BACKGROUND*

Child was born in November 2020 to Mother and J.B. (Father).[2]  The juvenile court explained:

_____

[1] The court also ordered that reunification "remain a concurrent goal."  Order, 2/20/26, at 2; *see also Int. of K.C.*, 319 A.3d 596, 602 (Pa. Super. 2024) (noting "this Court wholly approves of the trial court's use of concurrent planning" when it "both protects the child from foster care drift by allowing agencies to consider adoptive resources (including kinship care) while keeping alive the potential of reunification.").

[2] Father agreed to relinquish his parental rights, and on December 19, 2025, he signed a consent to Child's adoption.  *See* N.T., 2/20/26, at 6.

The Agency became involved with the maternal family in June of 2022, following a report that Mother had been engaging in illicit substance use while caring for Child. At the time, the Agency implemented a Safety Plan for Mother, which temporarily placed Child in the care of Maternal Grandparents. Mother subsequently entered inpatient treatment at Gaudenzia for twenty-eight (28) days in July of 2022. On July 22, 2022, during an unannounced home visit, the Agency confirmed reports that Maternal Grandparents were intoxicated while caring for Child.

On July 25, 2022, Child went to reside [in] kinship placement [with Foster Father], where Child's maternal half-sibling[, A.B.,] also resides.[3] The Agency continued to meet with Mother and provided her referrals to inpatient rehabilitation services, but Mother's struggles with substance abuse and obtaining and maintaining sobriety persisted throughout the remainder of 2022 and 2023.

Although Mother's Safety Plan was lifted on June 13, 2023, Child remained with [Foster Father]. Mother was unable to maintain employment and continued to reside in a home that—by her own admission—was not appropriate for Child.

Mother and Father signed a Voluntary Placement Agreement ("VPA") on March 21, 2024. With the VPA set to expire, the Agency filed a Dependency Petition on April 1, 2024. The [c]ourt held a hearing on April 5, 2024, at which Father appeared and stated his wish to relinquish his parental rights. Mother also appeared and stipulated to facts supporting an adjudication of dependency, but objected to placing Child with [Foster Father]. The [c]ourt issued an Order that same day adjudicating Child dependent and transferring physical and legal custody to the Agency. Child remained in his kinship placement with [Foster Father] and Child's half-sister.

Juvenile Court Opinion (JCO), 4/16/26, at 2-3 (citations omitted).

On January 26, 2026, the Agency filed a motion to change Child's permanency goal from reunification to adoption. The juvenile court held a hearing on February 20, 2026. The Agency presented testimony from the

_____

[3] Foster Father had been in a relationship with Mother and is the father of A.B.

caseworker, Riley Lebofsky, as well as Foster Father. Mother did not present any witnesses and did not testify. The court also heard from Child's guardian *ad litem*, who advocated for changing Child's permanency goal to adoption.

Ms. Lebofsky recounted Mother's ongoing use of illegal drugs, particularly fentanyl, and testified that the Agency sought to change Child's permanency goal to adoption because Mother had made "minimal" progress in addressing her drug use. N.T. at 10-11. Ms. Lebofsky stated:

> [Mother] left Silver Linings treatment when she was supposed to have a higher level of care, and she continues to test positive for illicit substances such as cocaine, methamphetamine, amphetamines, fentanyl, and she admitted to the use of trank in the past. … I believe the use of trank was two weeks ago.

*Id.* at 12.

The Agency's counsel asked Ms. Lebofsky:

Q. What do you believe the appropriate permanency goal is for [Child]?

A. Adoption.

Q. And why do you believe that?

A. [Foster Father] is not [Child's] biological father; however, he's chosen to be [Child's] father. He's provided consistency and care and ultimately love, and can meet [Child's] needs…. And they have a great relationship. And [Child] also resides with his half-sister[, A.B.].

Q. And does [Child] see [Foster Father] as his father?

A. Yes, he calls him daddy.

*Id.* at 20.

According to Ms. Lebofsky, Foster Father was an adoptive resource who "wants consistency in [Child's] life and wants him to have permanency." ***Id.*** at 21. She said that she did not "see any negative consequences [with] adoption." ***Id.*** at 29.

Foster Father confirmed he is the father of Child's half-sister, A.B., who was 10 years old at the time of the hearing. ***Id.*** at 41. He testified to having sole legal and physical custody of A.B., and caring for Child for "three and a half years." ***Id.*** at 40-41. Foster Father stated that A.B. "absolutely" considers Child to be her brother, and that Child calls him "Dad." ***Id.*** at 42.

The Agency's counsel asked Foster Father:

Q. [Have you] managed to maintain a relationship with [Mother]?

A. To some degree, yes.

Q. When you say to some degree, can you explain what that mean?

A. She has had contact as far as supervised visits as well as the unsupervised [visits in the past], and I did nothing to impede upon the visits.

Q. [W]hat is your main concern about any contact between [Mother] and [Child] moving forward?

A. That sobriety be monumental.

Q. When [Mother] was in a place of sobriety, was there any issue with having [Child] see [her]?

A. I'm not a hundred percent sure that sobriety had taken place, but I do not know the details.

Q. If [Mother] is in a place of sobriety in the future, do you believe it's important for [Child] to know who she is?

A. Yes.

Q. And to have some contact with her?

A. Absolutely, yes.

*Id.* at 40-41.

In response to questions from Child's guardian *ad litem*, Foster Father stated that Mother had visited A.B. in the past, "when she was sober," but she was not visiting A.B. at the time of the hearing. *Id.* at 41. Nonetheless, Foster Father noted that he, A.B. and Child maintained a relationship with Mother's family. *Id.* He also reiterated that he would never prevent Mother from seeing Child. *Id.* at 43. Finally, Foster Father confirmed Ms. Lebofsky's testimony that he would like to adopt Child, and testified that he preferred adoption to subsidized permanent legal custody (SPLC).[4] *Id.* at 43-44.

At the conclusion of the hearing, Child's guardian *ad litem* stated that she was "in favor of the goal change to adoption." *Id.* at 45. The guardian *ad litem* explained:

> The [c]ourt looks at what's in the best interests of [Child].
>
> So we look at he's been in the care of [Foster Father] for basically his entire life, be it on a safety plan and then officially in foster care.
>
> His biological father realizes it's in his best interest that [Foster Father] provide for all his needs and welfare and signed a voluntary consent [to adoption].

_____

[4] SPLC is "an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis to a custodian. Parental rights are not terminated." *In re S.H.*, 71 A.3d 973, 977-78 (Pa. Super. 2013).

> There's a relationship with [Mother's] side of the family, because [Foster Father] and [Mother] have a child together….
>
> [Foster Father] has been caring for [Child] his whole life essentially. And I think it's in his best interest, at this time, that the goal to be changed to adoption.
>
> … At this point in time, [Mother is] struggling with her substance abuse. [Child] needs consistency. He's getting older now. [Mother being i]n and out of his life is not giving him what he needs.
>
> The only stability he's gotten in his young life is with [Foster Father]. At this point, I'm in favor of adoption.

*Id.* at 45-46.

After the hearing, the juvenile court issued the order changing Child's permanency goal from reunification to adoption. Mother filed a timely notice of appeal and concise statement pursuant to Pa.R.A.P. 1925. Mother claims:

> I. The [juvenile] court committed an error of law and abuse of discretion by changing the permanency goal of [Child] to adoption, where adoption was not an appropriate goal.
>
> II. The [juvenile] court committed an error of law and abuse of discretion by changing the permanency goal of [Child] from reunification to adoption, where [SPLC] was available and more appropriate.
>
> III. The [juvenile] court violated Mother's constitutional rights under the Due Process Clause by changing the permanency goal of [Child] from reunification to adoption, where SPLC was available and more appropriate.
>
> IV. The Agency failed to present evidence that infringing on Mother's fundamental right as a parent by changing the permanency goal to adoption when SPLC was available and more appropriate, was a compelling state interest and narrowly tailored to achieve that interest.
>
> V. The Agency violated Mother's constitutional rights under the Due Process Clause when it failed to meet the strict scrutiny standard in changing the permanency goal of [Child] from

- 6 -

reunification to adoption, where SPLC was available and more appropriate.

Mother's Brief at 7-8.

All of Mother's issues concern SPLC. In the summary of her argument,

Mother asserts:

> The [c]ourt erred and abused its discretion in changing the permanency goal from reunification to adoption when SPLC was available and a more appropriate goal based on [C]hild's best interests. Changing the goal from reunification to adoption, when SPLC was an available and more appropriate goal violates [C]hild and Mother's constitutional right to family integrity.

*Id.* at 9. Mother's argument is unconvincing. As the juvenile court observed, "Mother challenges the [c]ourt's decision not because she believes reunification should remain the primary goal, but rather because she believes it was improper for the [c]ourt to choose adoption over SPLC." JCO at 14.

*DISCUSSION*

This Court reviews an order changing a dependent child's placement goal for an abuse of discretion. ***Int. of K.C.***, 310 A.3d 296, 303 (Pa. Super. 2023). We recently summarized the applicable law as follows:

> A petitioning agency has the burden to show a goal change would serve the child's "best interests," and the "safety, permanency, and well-being of the child must take precedence over **all** other considerations" under [42 Pa.C.S. §] 6351. ***R.M.G.***, 997 A.2d [339,] 347 [(Pa. Super. 2010)] (emphasis in original; internal citation and quotation marks omitted). In the context of goal change proceedings, "[t]he parent's rights are secondary." ***Id.*** With specific reference to a goal change to SPLC, "the [juvenile] court must find that neither reunification nor adoption is best suited to the child's safety, protection and physical, mental and moral welfare[.]" ***Interest of D.G.***, 241 A.3d 1230, 1241 (Pa. Super. 2020) (internal citation and quotation marks omitted).

- 7 -

*Int. of C.B.*, --- A.3d ---- (Pa. Super. filed Apr. 23, 2026), 899 WDA 2025, 2026 WL 1102827 at *9, *reargument denied* (June 8, 2026); *see id.* at *7-8 (noting "state's well-recognized interest in safeguarding [a child's] welfare" and rejecting claim that goal change order violated a parent's "constitutional rights to familial integrity").

Here, the juvenile court expressly found that adoption is best suited to Child's safety, protection and welfare. The court reasoned:

> Based on the uncontested evidence presented at the hearing, the [c]ourt determined that a goal change to adoption was best suited to the safety, protection, and physical, mental, and moral welfare of Child. Without being able to rule out adoption as an appropriate goal, the explicit language of Section 6351(f.1)(1)-(3) compelled the [c]ourt to reject Mother's request for a goal change to SPLC. The [c]ourt's Order is consistent with the policy underlying the Juvenile Act of promoting permanency, as adoption brings greater permanency than SPLC. [*See*, *e.*]*g*., *Interest of K.C.*, 319 A.3d 596, 600 (Pa. Super. 2024) (citation omitted); *In re A.B.*, 19 A.3d 1084, 1088 (Pa. Super. 2011) (citation omitted); 42 Pa.C.S. §§ 6351 (e)-(f.1).

JCO at 2. The court noted Mother's "disagreement as to the hierarchical nature of the Juvenile Act's permanency options, which places adoption as the second-most favored option, ahead of SPLC," and correctly concluded it was "bound by the General Assembly's directive as reflected in the plain language of Section 6351 (f.1)." *Id.* at 14. The court further explained:

> The [c]ourt came to this conclusion in light of Child's young age and the fact that Child had been [adjudicated dependent] for twenty-three (23) months[,] and had been residing with [Foster] Father prior to [the dependency adjudication] for nineteen (19) months—meaning Child has been out of Mother's care and with [Foster] Father for [more than three and a half years]. Mother's failure to make necessary progress toward alleviating the

circumstances that necessitated Child's placement left the [c]ourt without confidence that reunification would be possible within any reasonable period of time, especially given that the case had already extended well beyond what the law contemplates for achieving permanency. Further, the [c]ourt found the Agency had made reasonable efforts to assist Mother toward the goal of reunification. Accordingly, the [c]ourt determined that Child was in great need of permanency, which could be provided by reframing the focus toward the goal of adoption. *In re D.P.*, 972 A. 2d at 1227.

Additionally, the [c]ourt found no compelling reason to rule out adoption as an appropriate permanency goal. None of the factors that may give rise to bypassing adoption in order to pursue alternative permanency options existed in this case. Child is still at a young age and does not have any special needs that may make placement in an adoptive home difficult. *In re S.H.*, 71 A. 3d at 978.

Furthermore, the Agency presented testimony that Father voluntarily signed to terminate his parental rights and consent to adoption. [Foster] Father has expressed his full agreement and interest in proceeding to adoption in order to provide Child with much-needed permanency. Ms. Lebofsky testified that [Foster] Father has "provided consistency and care and ultimately love, and can meet [Child's] basic needs whenever he needs him," that Child and [Foster] Father "have a great relationship," and that Child resides with [Foster] Father along with his half-sister. [Foster] Father already maintains a positive relationship with Child's maternal family and plans to continue doing so moving forward. The [guardian *ad litem*] supported the change to adoption. Mother, in turn, produced no evidence contesting the Agency's assertion that adoption would be in Child's best interest.

*Id.* at 15-16 (citations to notes of testimony omitted).

The juvenile court did not abuse its discretion. To the contrary, the court properly weighed the evidence and applied the law in deciding to change Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/4/2026</u>